IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SANDRA K. CHEATHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15-cv-1382-JPG-CJP |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM and ORDER

**GILBERT, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Sandra K. Cheatham, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Ms. Cheatham applied for benefits in August 2012 alleging disability beginning on September 1, 2010. (Tr. 17.) After holding an evidentiary hearing, ALJ Joseph L. Heimann denied the application for benefits in a decision dated August 15, 2014. (Tr. 17-26.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1.) Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ failed to consider evidence of plaintiff's mental impairments, erroneously

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

failed to find that she had a serious mental impairment, and failed to account for her mental limitations in his assessment of her residual functional capacity.

2.   The ALJ erred in determining that plaintiff could return to her past work because he failed to correctly analyze her past work as a composite job.

3.   The ALJ's findings with regard to adjustment to other work and transferable skills was erroneous and based on vocational expert testimony that conflicted with the *Dictionary of Occupational Titles* and lacked a reliable basis.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. § 423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit.   20 C.F.R. § 404.1572.

In a DIB case, a claimant must establish that she was disabled as of her date last insured. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).    It is not sufficient to simply show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date.  *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

Social Security regulations set forth a sequential five-step inquiry to determine whether a

claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity.   The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling.   If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues.   The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work.   If an applicant can engage in past relevant work, he is not disabled.   The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work.   If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined:   (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads

either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive…." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Cheatham was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the Court takes into consideration the entire administrative record does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Heimann followed the five-step analytical framework described above. He determined that Ms. Cheatham had not been engaged in substantial gainful activity since the

alleged onset date and that she was insured for DIB through December 31, 2013.   He found that plaintiff had severe impairments of hip osteoarthritis with osteopenia, left knee osteoarthritis, lumbar osteoporosis, status post mitral valve replacement, hypertension, and asthma.   He further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Cheatham had the RFC to perform work at the sedentary exertional level with a number of physical limitations.   He did not assign any mental limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do her past work as a recruiter as that job is generally performed and as it was performed by her.   He made an alternative finding that she was also able to do other work and had transferable skills to jobs such as telemarketer and appointment clerk.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

**1.    Agency Forms**

Ms. Cheatham was born in 1948.   She was 62 years old on the alleged onset date and 65 years old on the date last insured.   (Tr. 204.)   She said that she had worked as an ISO auditor for an electronics refurbishing company.   (Tr. 209.)

Plaintiff filed a Function Report in October 2012 in which she said her ability to work was limited by symptoms from arthritis in her low back and both hips, as well as heart disease.   (Tr. 215.)   She also alleged difficulty with memory and concentration.   (Tr. 220.)   Among her medications was alprazolam (Xanax), which calmed her down.   (Tr. 222.)   In February 2013, she

said she was taking alprazolam for panic attacks.   (Tr. 228.)    In May 2013, she said that Dr.

Steele was treating her for anxiety, insomnia, muscle spasm and chronic pain.   (Tr. 243.)

### 3.    Evidentiary Hearing

Ms. Cheatham was represented by an attorney at the evidentiary hearing.   (Tr. 31.)

Plaintiff explained her work history in detail.   For the fifteen years before her alleged date

of onset, she worked for a company called Bigston or for one of its affiliates.[2]   For the first five

years, 1995-2000, she worked for an affiliate called ABC Resources.   This was an internal

employment agency for Bigston.   At that time, Bigston did refurbishing and repair work on

Canon cameras.   Plaintiff functioned during those years as an administrative assistant.   She

interviewed potential new employees, did payroll, and handled unemployment issues.   (Tr.

42-45.)   For part of her time, she was functioning as a personnel recruiter.   Technical schools in

the area would contact her regarding job openings, and send job applicants to her.   She would

interview the applicants and administer a test that had been developed by an engineer.   The

engineer would review the tests and would advise on which prospects might be a good fit.

Plaintiff would then call them in for second interviews.   She estimated that she spent about one

hour a month on the phone with the schools.   In addition, she spent some period of time

interviewing candidates and administering the test.   (Tr. 54-55.)

In 2000, she became an ISO auditor for Bigston.   She would spend time on the floor

learning what the technicians did, and then would draft standardized processes.   (Tr. 45-51.)

Plaintiff testified that she was unable to work because of pain in her back and hips.   Also,

she had a heart valve replaced more than twenty years earlier and she had atrial fibrillation.   (Tr.

---

[2]  The transcript of the hearing misspells the name of plaintiff's employer as "Bigstown."   The agency's earnings
records spell it as "Bigston."   *See* Tr. 189.

56.)   She had stenosis in her spine.   She was needle-phobic.   She had been told that she needed

hip replacements.   She had no insurance from the time she stopped working in September 2010

until she turned 65 in March 2013 and went on Medicare.   She took "early retirement" in 2012.

(Tr. 63-66.)   She had not had hip replacement surgery because she was "terrified of surgery."

(Tr. 67.)

A vocational expert (VE) testified that plaintiff's past work for ABC Resources and

Bigston was comprised of three jobs:   assurance auditor, DOT 168.367-022, light, semi-skilled

with an SVP of 6; administrative clerk, DOT 219.362-010, light, semi-skilled with an SVP of 4;

and recruiter, DOT 166.267-010, sedentary, semi-skilled with an SVP of 6.   (Tr. 51-52.)

The ALJ asked the VE a hypothetical question that corresponded to the RFC assessment.

The VE testified that this person could do plaintiff's past work as a recruiter.   She testified that

plaintiff had transferrable skills in the areas of clerical, computer and customer service from her

jobs as an assurance auditor and administrative clerk.   She would also be able to do other jobs

such as telemarketer, appointment clerk, and billing clerk.   (Tr. 78-81.)

Plaintiff's counsel raised an issue as to whether the recruiter job should be treated as a

separate job "even though it was a combination of what she was doing in that current job?"   The

ALJ stated that the recruiter job "was identified as a second job" and said that counsel could make

the argument that "it doesn't qualify as past relevant work because she didn't do it fulltime…."

(Tr. 80.)

The ALJ acknowledged that, if plaintiff were limited to simple, routine and repetitive work

(*i.e.*, unskilled work) she would be deemed disabled because of her age.   (Tr. 82.)

Plaintiff's counsel pointed out that, with regard to transferrable skills, plaintiff's past work

was in a different industry from the other jobs identified by the VE.   She asked the VE whether

plaintiff would have to make vocational adjustments to do the other jobs which the VE identified,

and the VE replied in the negative.   The ALJ noted that this was an "excellent point" and then had

the following exchange with the VE:

> Q:     So, are the jobs so similar to the claimant's past work that the claimant would need
>         to make very little if any vocational adjustments in terms of tools or processes or
>         work setting or the industry?
>
> A:     It says or the industry.
>
> Q:     It does say or.
>
> A:     But the work processes is in.  [sic]  Those are the things that she didn't.   [sic]
>         She typed, she used clerical skills, she talked with people, customer service.   You
>         know, it wouldn't –
>
> Q:     If you will, those types of skills transcend industries, if you will –
>
> A:     Right.

(Tr. 83-84.)

The ALJ acknowledged that "we don't get these cases very often and I'll have to go back

and look at the regulations.   I'm not exactly [sic] how I am supposed to read that phrase and what

modifies what in terms of what the regulatory limitations are."   The VE interjected, "Any

industry.   That's what I was saying, that all three of those jobs are any industry."   The claimant

stated that she had worked in the electronics industry.   The VE then testified, "Right and that's

where I took the administrative clerk and the recruiter from, if you would look on your screen."

(Tr. 84-85.)

### 4.   Medical Records

In 2011, Dr. Hilgard noted that plaintiff had a long history of mitral valve disease.   She

had a mitral valve replacement around 1990. She also had atrial fibrillation. (Tr. 282.)

Dr. Lyon noted in 2008 that plaintiff had severe bilateral hip arthritis and was a candidate for bilateral total hip replacement. (Tr. 402.)

Bryan Steele, a primary care physician, treated plaintiff from December 2012 to March 2013. Among other medications, he prescribed Hydrocodone and Xanax. (Tr. 319-22.)

Plaintiff was seen by Dr. Davila, a rheumatologist who practiced at Alton Orthopedic Clinic, in June 2013. She noted that plaintiff had bilateral hip osteoarthritis and left shoulder pain. Dr. Davila wrote that she discussed options with Ms. Cheatham, and "she is adamantly against any sort of surgery. She is also afraid of needles and defers any injections." She prescribed physical therapy. (Tr. 369-76.)

Plaintiff was treated at Piasa Pain Center from June 2013 to January 2014. (Tr. 324-41.) Among her complaints on the first visit were anxiety, depression and sleeping difficulties. (Tr. 339.) Dr. Buenger suggested a psychological referral. (Tr. 341.) Later in June 2013, a family nurse practitioner noted she had "an extreme fear of needles and surgery." (Tr. 335.)

Plaintiff began seeing Shannon Walker, Ph.D., a psychologist, for counseling in June 2013. Dr. Walker noted that she had a "phobia of needles that is interfering with her ability to get medical care" and anxiety about her heart condition, which also interfered with her ability to access care. (Tr. 358.) Plaintiff reported that her doctor wanted to replace her hips, but she was afraid to have the surgery. She said that her other option was to have injections from Dr. Buenger, but she was afraid of the needles. (Tr. 354.)

## Analysis

An ALJ is required to consider the combined effects of all of the claimant's impairments,

including impairments that, by themselves, are not severe or disabling.   *Williams v. Colvin,* 757 F.3d 610, 613 (7th Cir. 2014).   Here, the ALJ never mentioned plaintiff's depression, anxiety, or needle phobia, and did not refer at all to Dr. Walker's records.

Plaintiff argues that the ALJ erred in failing to find that she had a severe mental impairment.   However, the step two identification of severe impairments is merely a threshold determination; the failure to identify a particular impairment as severe is harmless as long as the ALJ finds at least one severe impairment and goes on to complete the analysis.   *Castile v. Astrue,* 617 F.3d 923, 927 (7th Cir. 2010).   Plaintiff is correct, though, that the failure to consider the combined effects of her physical and mental impairments was error.

The records of the doctors who treated plaintiff's physical symptoms indicate that she declined certain modes of treatment because she feared needles and surgery.   Dr. Steele prescribed medication for anxiety.   Healthcare providers at the pain clinic noted her fear of needles and surgery, and Dr. Walker noted that her needle phobia and anxiety interfered with her ability to get needed medical care.

The ALJ did not mention that plaintiff took medication for anxiety, and he ignored the medical evidence indicating that plaintiff declined treatment because of anxiety and her phobia. This was error, and it cannot be deemed to be harmless.   The ALJ noted that plaintiff had not received much treatment and that her treatment had been conservative.   (Tr. 21, 23.)   He noted that she declined "surgical or injection interventions," but apparently did not consider that she declined because of her anxiety and phobia.   (Tr. 22.)

The Commissioner argues that the ALJ was not required to discuss the evidence concerning plaintiff's mental impairment because plaintiff never alleged that she had limitations

arising from her mental health.   Doc. 24, p. 4.   This is incorrect.   Plaintiff's responses to the agency's forms indicated that her primary care physician was treating her for anxiety and that she was taking alprazolam (Xanax).   She also alleged difficulty with memory and concentration. (Tr. 220, 222, 228, 243.)   In any event, the ALJ is required to consider "impairment(s) that you say you have or about which we receive evidence."   20 C.F.R. § 404.1512(a).   Obviously, the medical records contained evidence of plaintiff's mental condition and evidence that her mental condition affected the treatment she received for her physical impairments.

Defendant also argues that the failure to consider plaintiff's mental limitation was harmless because no physician opined that she had any limitations arising from a mental health impairment and her needle phobia was diagnosed only three months before her date last insured.   The Court disagrees.   It is clear that the ALJ considered the lack of surgical or injection treatment in assessing the severity of plaintiff's physical impairments.   Further, it appears that the ALJ gave no consideration at all to whether plaintiff had work-related limitations arising from her mental impairment.   There was no psychological consultative exam, and no state agency consultant was asked to assess her mental RFC.

The failure to consider whether plaintiff suffered from any mental limitations is particularly egregious in this case.   Because of her age, if plaintiff were limited to sedentary work at the unskilled level, she would be deemed disabled.   20 C.F.R. § 404.1568(d)(4); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(d).   The ALJ acknowledged as much at the hearing.   (Tr. 82.) The failure to consider plaintiff's mental impairments and to consider the combined effects of her mental and physical impairments was error and requires remand.

Plaintiff also argues that the ALJ erred in determining whether she could do her past work

because the ALJ failed to treat her past work as a composite job.

In determining whether a claimant can perform the functional demands and job duties of her past job, the "*Dictionary of Occupational Titles* (DOT) descriptions can be relied upon -- for jobs that are listed in the DOT -- to define the job as it is *usually* performed in the national economy."  SSR 82-61, 1982 WL 31387, at *1 (emphasis in original).  However, "composite jobs have significant elements of two or more occupations and, as such, have no counterpart in the DOT.  Such situations will be evaluated according to the particular facts of each individual case." *Id.*

At the hearing, the VE testified that plaintiff had worked at three different jobs at Bigston and its related company, *i.e.*, administrative clerk, recruiter, and personnel quality assurance auditor.  The VE testified that "the last one" was personnel quality assurance auditor; she was presumable referring to plaintiff's job as an ISO auditor.  (Tr. 52.)  The ALJ questioned plaintiff on whether "part of her job was recruiting" in the first five years when she worked for ABC.  (Tr. 53.)  The VE's testimony and the ALJ's questioning suggest that the job that plaintiff did for the first five years at ABC was a composite job.

The agency's own Program Operations Manual (POMS), states the following with regard to composite jobs:

> Composite jobs have significant elements of two or more occupations and as such, have no counterpart in the DOT.  If you can accurately describe the main duties of [past relevant work] only by considering multiple DOT occupations, the claimant may have performed a composite job. . . .   When comparing the claimant's RFC to a composite job as it was performed, find the claimant capable of performing the composite job only if he or she can perform all parts of the job.   A composite job will not have a DOT counterpart, so do not evaluate it at the part of step 4 considering work "as generally performed in the national economy."

POMS  DI  25005.020,  https://secure.ssa.gov/apps10/poms.nsf/lnx/0425005020 (visited  Feb.  7,

2017).

Although he described plaintiff's past work by referring to three different DOT occupations, the ALJ did not explicitly state whether he considered her past work to be a composite job.   (Tr. 24.)   Plaintiff's counsel raised the issue at the hearing, although she admittedly said "combination" and did not use the phrase "composite job."   (Tr. 80.)   The Court is not suggesting that the ALJ was required to find that plaintiff's past work was a composite job. However, on this record, it was error for the ALJ to omit any explanation of how he determined whether or not plaintiff's past work was a composite job.   In order to permit meaningful review, the ALJ must explain how he reached his conclusions.   Remand is required where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review."   *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012)(internal citation omitted).

For similar reasons, the Court finds that the ALJ's explanation of how he determined that plaintiff had transferrable skills was also insufficient.

Again, because of Ms. Cheatham's age, if she were limited to sedentary work and unable to do her past work, she would be deemed disabled unless she has skills that are transferrable to other skilled or semiskilled work.   20 C.F.R. § 404.1568(d)(4); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(d).

For a person in plaintiff's age category who is limited to sedentary work, "we will find that you have skills that are transferable to skilled or semiskilled sedentary work only if the sedentary work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry."   20 C.F.R. § 404.1568(d)(4).

Plaintiff argues that the conclusion that plaintiff has transferrable skills is not supported by substantial evidence because the evidence was unclear as to whether the jobs testified to by the VE would require a vocational adjustment in terms of industry.   *See* VE's testimony at Tr. 83-84, quoted above.

The jobs that the VE testified to, telemarketer, appointment clerk, and billing clerk, are in industries other than the electronics industry.[3]   The meaning of the VE's testimony is unclear regarding whether those jobs would require a vocational adjustment in terms of industry.   The Commissioner admits that "some portions of the transcript are not entirely clear" and argues that the VE "misspoke" when she testified that all three of the jobs were in the same industry.   Doc. 24, pp. 13-14.   However, given the importance of the issue of transferability of skills in this case, the Court cannot indulge the assumption that the VE simply misspoke.

It is also unclear how the ALJ understood the relevant regulation on transferability of skills; he remarked at the hearing that "we don't get these cases very often and I'll have to go back and look at the regulations.   I'm not exactly [sic] how I am supposed to read that phrase and what modifies what in terms of what the regulatory limitations are."   (Tr. 84.)

The ALJ never explained how he understood the relevant regulation or how he determined that plaintiff's skills were transferrable within the meaning of the regulation.   The agency itself provides the following guidance:

> To find that an individual who is age 55 or over and is limited to sedentary work exertion has skills transferable to sedentary occupations, there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry.   The same is true for individuals who are age 60 and older and are limited to light work exertion.   Individuals with these adverse vocational profiles cannot be expected to make a vocational adjustment to substantial changes

---

[3] For reasons that he did not explain, the ALJ did not make a finding that plaintiff would be able to do the job of billing clerk.

in work simply because skilled or semiskilled jobs can be identified which have some degree of skill similarity with their PRW.  In order to establish transferability of skills for such individuals, the semiskilled or skilled job duties of their past work must be so closely related to other jobs which they can perform that they could be expected to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation.

SSR 82-14, 1982 WL 31389, at *5.

There is no indication in the ALJ's decision that he engaged in the kind of analysis described above.  Rather, it appears that he unquestioningly adopted the VE's bottom-line statement that plaintiff had transferrable skills.  With no explanation of how he reached that conclusion, the Court is unable to review whether it is supported by substantial evidence. *Kastner*, 697 F.3d at 646.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Cheatham was disabled at the relevant time or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Sandra K. Cheatham's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE:   February 10, 2017**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**